CHRISTOPHER D. JONES,

        Plaintiff,

v.                                                   Case No. 17-cv-788-pp

CHRISTOPHER MANTHEI, *et al.*,

        Defendants.

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 22) AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 18)**

The plaintiff, representing himself, filed this lawsuit under 42 U.S.C. §1983. Dkt. No. 1. The court screened the complaint and allowed him to proceed on claims that the defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment when they failed to follow a no-work restriction that had been put in place by medical staff. Dkt. No 9. The parties filed cross-motions for summary judgment. Dkt. Nos. 18, 22.

**I.    RELEVANT FACTS[1]**

Plaintiff Christopher Jones is incarcerated at the Waupun Correctional Institution. Dkt. No. 31 at ¶1. During the events the plaintiff described in the complaint, the defendants were employed at Waupun. Id. at ¶2. Christopher Manthei and Nicholas Sanchez worked as correctional sergeants, Brenda

---

[1] The court takes the relevant facts from "Defendants' Response to Plaintiff's Proposed Findings of Fact" and "Plaintiff's Response to Defendants' Proposed Findings of Fact." Dkt. Nos. 28, 31. The facts are undisputed unless the court indicates otherwise.

1

Rilling worked as a bakery chef and Aimee Wilson worked as the food services administrator. Id.

In February 2017, the plaintiff worked as a window server in the kitchen at Waupun. Id. at ¶4. His primary duties included distributing trays of food to inmates and cleaning up after meals. Id. At that time, the plaintiff was on a light activity restriction because of chronic left knee pain from a basketball injury. Id. at ¶5. A "light activity" restriction allowed the plaintiff to do his kitchen job—he could work at his own pace, and could tell staff if there were job duties and assignments that he couldn't perform. Id. at ¶6.

On February 24, 2017, the plaintiff was seen in health services for an injury to his right knee that he suffered while playing basketball the night before. Id. at ¶7. The nurse instructed the plaintiff to rest, ice and elevate his knee. Id. She also gave him a no-work restriction until March 1, 2017. Id. The nurse's notes reflect that she updated the prison's computer system to reflect a no-work restriction, but the notes did not indicate that she told any of the four defendants about the no-work restriction. Id. at ¶8.

A few days later, a nurse contacted the plaintiff and told him that the x-ray of his knee was normal. Id. at ¶9. She also told him to stay off of work until after his scheduled follow-up appointment on March 1, 2017. Id. On March 1, 2017, before his appointment, the plaintiff reported to his work assignment in the kitchen. Id. at ¶10. The plaintiff explains that his name was on the schedule for that day, and inmates are not free to decline to report to work once they are called. Id. Instead, an inmate must report to his worksite and then discuss with the sergeant at the worksite any concerns he has about

working. Id. The plaintiff reported to work because he was afraid he would receive a conduct report if he did not. Id. at ¶11.

After his work shift on March 1, 2017, nursing staff evaluated the plaintiff's knee. Id. at ¶15. The plaintiff reported that his knee was feeling better, but it still hurt. Id. A nurse extended his no-work restriction to March 8, 2017. Id. Despite the extension of his no-work restriction, the plaintiff continued to work his normal schedule, which generally was every other day, sometimes for shifts that lasted all day. Id. During this time, there were certain duties that he could not do because they required too much lifting; as he did when his light-duty restriction was in place, he would tell kitchen staff what he wasn't able to do. Id. at ¶16.

On March 8, 2017, nursing staff saw the plaintiff for a follow-up evaluation. Id. at ¶17. After noting the care plan—applying ice, not working and avoiding recreational activities—the nurse extended the plaintiff's no-work restriction to April 8, 2017, "pending an evaluation by the prison's physician." Id. at ¶18. Nothing in the nurse's notes indicate that the plaintiff complained that he was still working despite the no-work restriction. Id. at ¶19.

On March 14, 2017, the plaintiff told defendant Wilson that he was on the no-work restriction. Id. at ¶35. He asked Wilson why he continued to work when he was on a no-work restriction; Wilson responded that she hadn't received anything from health services about the plaintiff being on a no-work restriction. Id. at ¶36. The plaintiff asserts that after he told Wilson the restriction was in the computer, she responded that she didn't usually get the information on the computer system but that she would look into it. Id. at ¶37.

3

According to Wilson, she did not learn the plaintiff was on a no-work restriction until after the plaintiff was injured on March 19, 2017. Id. at ¶38.

The plaintiff states that he also told Manthei that he was on a no-work restriction, although he doesn't remember when. Id. at ¶39. According to the plaintiff, Manthei thought the plaintiff was joking. Id. Manthei responded to an interrogatory from the plaintiff, in which Manthei said that he knew that the plaintiff had been placed on the light duty restriction in mid-February 2017, but said that he did not know about the no-work restriction until March 21, 2017. Id. at ¶¶39-40. The plaintiff also informed his psychologist (who informed a lieutenant who informed the cell hall sergeant) and unnamed nurses that he was still working despite being on a no-work restriction. Id. at ¶¶41-43. None of these individuals are defendants, and there is nothing in the record to indicate that any of them informed the kitchen staff of the no-work restriction. Id.

On the afternoon of March 19, 2017, the plaintiff was working in the kitchen. Id. at ¶20. Wilson was not working that day, Manthei was the sergeant in charge of food service for first shift (until around 12:30 p.m.) and Sanchez was the food service sergeant for second shift (starting at 2:00 p.m.); Rilling was working in the bakery. Id. At about 4:30 p.m., the plaintiff was carrying a stack of food trays when his right knee made an audible popping sound and buckled. Id. at ¶21; Dkt. No. 28 at ¶32. The plaintiff dropped the trays and fell into the counter of the service table. Dkt. No. 28 at ¶32. Two inmates helped the plaintiff to "the north side tray disposal bench area"; Sanchez approached the plaintiff. Dkt. No. 28 at ¶33; Dkt. No. 31 at ¶22. The plaintiff told Sanchez that he wasn't supposed to be working. Dkt. No. 31 at ¶23. Sanchez told the

4

plaintiff that the schedule indicated he was on a light-duty restriction. Id. (The schedule continued to show that the plaintiff was on light duty. Id. at ¶24.) Sanchez then checked the computer and saw that, contrary to what the work schedule indicated, the plaintiff was on a no-work restriction. Id. at ¶25. The plaintiff was escorted to health services around 5:00 p.m. Id. at ¶26.

The plaintiff says that earlier in the day on March 19, he had told Sanchez that he was on a restriction, but he did not clarify that he was on a no-work restriction. Id. at ¶28. The plaintiff told Sanchez that he was not supposed to be working, but Sanchez responded that the schedule said the plaintiff was on a light duty restriction. Id. at ¶23. The plaintiff also told Sanchez that his knee hurt and that he wanted to go to health services. Id. at ¶30. Sanchez responded that health services would not see the plaintiff at that point for an injury that Sanchez believed was "a few days old." Id.

In the federal court complaint, the plaintiff recounted the following under the heading "RELEVANT FACT(S) OF INMATE COMPLAINT":

> On [March 19, 2017], I was stationed at my assigned post, as the Northside Window Server. Before meals started, I informed C.O. Kickerbaul as well as Sergeant Sanchez that I had injured my knee recently and I was in a [l]ot of pain because I had been standing up all day and needed to be seen by HSU, because the pain medication that HSU prescribed to me was not working. Sergeant Sanchez then responded in front of C.O. Kickerbaul, Inmate Timothy Wilks, Inmate Jackson and others, that since it has been a couple of days, he knows for a fact HSU will not see me. I then told him could he call and tell them I need to be seen for my on going knee issues. He then told me [that] he would not call because he knew I would not be seen for an injury that was a few days old.

Dkt. No. 1 at 3-4. (The plaintiff provided the court with a copy of the inmate complaint itself, WCI-2017-8045, at Dkt. No. 23-1, but it is barely legible in

5

some sections and illegible in others; the court assumes that the plaintiff's recitation of the text of the complaint is accurate.)

The plaintiff also asserted that around 3:00 p.m. on March 19, 2017, he told Rilling that he had a chronic knee injury, that he had been standing all day and he would not be able to carry the food trays at the end of his shift because the trays were too heavy and too much on his injured knees. Dkt. No. 31 at ¶31. The plaintiff asserts that Rilling told him that "he would be fine," or something along those lines. Id. at ¶32. The plaintiff asserts that he told Rilling that he "was on a medical no-work restriction regarding chronic knee problems with both [his] knees and that all of the additional standing and heavy lifting had caused [him] to ache really bad." Id. at ¶33. According to the plaintiff, Rilling responded that the position sheet said that the plaintiff was on a light-duty restriction, which in Rilling's mind did not prohibit him from lifting light-weight things. Id. at ¶34.

## II. DISCUSSION

### A. *Legal Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

6

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.  *Deliberate Indifference Standard*

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious medical needs of prisoners.'" Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997) (citations omitted). This standard contains both an objective element—that the medical needs be sufficiently serious—and a subjective element—that the officials act with a sufficiently culpable state of mind. Id. To survive summary judgment the plaintiff must set forth sufficient evidence such that a jury could reasonably conclude that he has proven each element of the standard with regard to each defendant.

The defendants concede, for purposes of summary judgment, that the plaintiff's knee condition was objectively serious and that requiring him to work placed him at substantial risk of harm. Dkt. No. 19 at 9. The court will focus its analysis only on the subjective element of the standard.

C.  *Analysis*

The defendants argue that the court must grant summary judgment in their favor because the plaintiff has not presented evidence from which a jury could reasonably conclude that any of the defendants knew that the plaintiff was on a no-work restriction at the time they allowed him to work. They highlight that "[i]t is not enough . . . that the [defendants] *ought* to have recognized the risk. Instead, 'the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Ricardo v. Rausch, 375 F.3d 521, 525-26 (7th Cir. 2004) (citations omitted).

The defendants concede that the plaintiff was on a no-work restriction on March 19, 2017. They also concede that he should not have been allowed to work. They even concede that they had access to the computer system, which, had they looked, would have revealed that a no-work restriction had been entered for the plaintiff. The defendants argue, however, that they are entitled to summary judgment because the plaintiff provided no evidence to suggest that any of the defendants were actually aware of the information needed to conclude that the plaintiff was at a risk of serious harm.

Manthei is entitled to summary judgment on that basis. Manthei asserts that prior to the plaintiff's injury, he believed the plaintiff was on a light-duty restriction and could work consistent with that restriction. The plaintiff asserts that he told Manthei he was on a no-work restriction (although he cannot remember when), but Manthei says he thought the plaintiff was joking. The plaintiff's acknowledgement that Manthei understood the plaintiff to be joking about his no-work restriction supports Manthei's claim that he did not know

8

that the plaintiff was facing a risk of serious harm by working. If Manthei did not know that the plaintiff was not supposed to be working, he cannot have been deliberately indifferent to the risk that the plaintiff faced.

Sanchez also is entitled to summary judgment. While the plaintiff told Sanchez on the day of the injury that he was on a restriction, the plaintiff concedes that he did not specify what type of restriction. Sanchez explains that he thought the plaintiff was talking about the light-duty restriction, reflected on the work schedule. Because Sanchez did not know that the plaintiff was on a no-work restriction until after the plaintiff injured his knee, Sanchez could not have been deliberately indifferent to the risk the plaintiff faced by working.

No reasonable jury could conclude that because Sanchez refused to let the plaintiff leave his work shift to go to health services for a days-old knee injury that was being treated with pain medication, he was deliberately indifferent to the plaintiff's medical need. This is especially true if one contrasts Sanchez's pre-knee-buckling response to the plaintiff's complaints of pain with his reaction after the plaintiff's knee buckled. *Before* the injury, Sanchez refused to let the plaintiff visit HSU for complaints of pain that Sanchez thought resulted from a days-old injury and for which he thought the plaintiff was taking pain medication. Sanchez's incident report[2] indicates that *after* the injury, he contacted a nurse, who instructed him to have the plaintiff escorted to HSU, and the plaintiff was escorted to the HSU approximately thirty minutes after the injury. The evidence demonstrates that Sanchez adjusted his response to the plaintiff's condition as circumstances demanded.

---

[2] Dkt. No. 23-1 at 16.

The court does not agree that Rilling is entitled to summary judgment. The plaintiff asserts that on the day he was injured, he told Rilling he was on a no-work restriction. Rilling told him that the schedule indicated he was on a light-duty restriction. Had that been the end of their interaction, Rilling would be entitled to summary judgment because, as with Manthei and Sanchez, she had reason to believe that the plaintiff was on a light-duty restriction and would not have known that allowing him to work placed him at risk of substantial harm.

But their interactions did not end there. The plaintiff also told Rilling that he did not believe he could carry the trays at the end of his shift because they were too heavy and his knees were hurting. Rilling concedes that she knew that the plaintiff was on a light-duty restriction. Dkt. No. 28 at ¶30. She also concedes that, consistent with that restriction, the plaintiff should have been permitted to work at his own pace, inform kitchen staff of what tasks he could and could not do and forgo lifting heavy objects. Id. at ¶15. Despite the plaintiff's light-duty restriction, Rilling ignored his request that he not be required to carry the food trays at the end of his shift. According to the plaintiff, she told him he would be fine. Id. at ¶28. If a jury were to credit the plaintiff's version of his interaction with Rilling, it could reasonably conclude that Rilling was deliberately indifferent to his serious medical needs when she exposed him to a risk of serious harm by requiring him to perform duties that were inconsistent with his light-duty restriction.

The court also concludes that Wilson is not entitled to summary judgment on the plaintiff's individual capacity claim against her. There is a genuine dispute as to an issue of material fact between the plaintiff's version of

the events involving Wilson and Wilson's version. The plaintiff asserts that he told Wilson he was on a no-work restriction about five days before he was injured, that she informed the plaintiff that she had not received information from health services about a no-work restriction, that he told her to look in the computer because the restriction was noted in there, and that Wilson said she would look it to it. Wilson claims that she did not know that the plaintiff was on a no-work restriction until she returned to work on March 20, 2017. The defendants argue that Wilson's account "must be credited at the summary judgment stage," dkt. no. 27 at 5, but that is not the standard. In a "he said, she said" situation, without independent evidence verifying either account, the law does not require the court to accept the moving party's version of events. That is a decision for the jury. If the jury were to credit the plaintiff's version of events, it could conclude that the plaintiff told Wilson that he was on a no-work restriction and that she had an easy way to confirm that assertion—by checking the computer. The computer would have shown the no-work restriction, so the fact that the plaintiff continued to be called in to work after talking with Wilson indicates either that she did not look at the computer, or that she did, but did nothing to stop the plaintiff being placed on the work schedule.

    The court will, however, grant summary judgment in Wilson's favor on the plaintiff's official capacity claim, in which he alleged that Wilson maintains an informal policy of allowing inmates to continue to work despite no-work restrictions. The plaintiff has not presented any evidence to support this claim. In fact, at his deposition, he conceded that he did not know of any other

inmates with no-work restrictions who were allowed to work. Dkt. No. 21-1 at 90-01 (Tr. Pp. 90-91). No jury could reasonably find in his favor on this claim.

Finally, the court finds that neither Rilling nor Wilson are entitled to qualified immunity. The plaintiff's deliberate indifference claim against Rilling survives because a jury could reasonably conclude that she refused to accommodate the plaintiff's well-documented injury despite her belief that he was under a light-duty restriction. The court finds that the plaintiff's right to have his documented injuries accommodated as medically ordered was well established at the time Rilling denied his request to be relieved of tray duty.

As for Wilson, the defendants concede that the plaintiff faced a substantial risk of harm when he was allowed to work despite a no-work restriction being in place. The question for a jury to decide is whether the evidence shows that Wilson "refused to verify underlying facts that [s]he strongly suspected to be true, or declined to confirm inferences of risk that [s]he strongly suspected to exist." Farmer v. Brennan, 511 U.S. 825, 843 n.8 (1994). The rule that a defendant cannot escape liability by sticking her head in the sand is well-established.

## III. CONCLUSION

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 22.

The court **GRANTS** the defendants' motion for summary judgment as to Manthei and Sanchez. Dkt. No. 18.

The court **DISMISSES** Manthei and Sanchez as defendants.

The court **GRANTS** the defendants' motion for summary judgment on the plaintiff's official capacity claim against Wilson. Dkt. No. 18.

The court **DENIES** the defendants' motion for summary judgment on the plaintiff's personal capacity claims against Wilson and Rilling. Dkt. No. 18.

Because the plaintiff has claims that survive summary judgment, the court will recruit counsel to represent the plaintiff. Once the court has found an attorney willing to represent the plaintiff, the court will provide the plaintiff with an agreement, which the plaintiff can sign if he agrees to accept representation under the conditions the court provides. Once counsel is on board, the court will set up a scheduling conference with the lawyers, to discuss next steps.

Dated in Milwaukee, Wisconsin this 4th day of February, 2019.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**United States District Judge**